Filed 5/5/25  P. v. Jones CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| THE PEOPLE, | C099705 |
| Plaintiff and Respondent, | (Super. Ct. No. 22CF05592) |
| v. | |
| NICHOLAS MATTHEW JONES, | |
| Defendant and Appellant. | |

A jury found defendant Nicholas Matthew Jones guilty of multiple sexual offenses against a minor and he received a determinate term of 12 years 8 months consecutive to 45 years to life in prison.  He appeals, arguing the trial court prejudicially erred and violated his constitutional rights to due process and to present a defense by refusing to continue the trial or to allow the defense to reopen its case to call his mother as a witness.  He also contends the court erred by failing to instruct on attempted sexual penetration as a lesser included offense on two counts, and that cumulatively these errors were prejudicial, requiring reversal.  Finding no merit to his contentions, we will affirm.

FACTUAL AND PROCEDURAL BACKGROUND

A.     *The Evidence at Trial*

In February 2023, defendant was charged with several sex offenses involving the minor daughter of a friend, as well as multiple drug offenses.

1

At trial, Carrissa B.[1] testified that she met defendant, the "love of [her] life," when she was around 13 years old and he was around 20 years old; they had an on-again, off-again relationship and shared two sons together.[2] Carrissa also had an infant daughter with another man. Around November 2022, defendant asked Carrissa to return to Butte County so defendant could meet her daughter because he wanted to adopt the little girl.

When she moved into the home that defendant shared with his mother, she felt something was "weird." P.W., the seven-year-old daughter of a mutual friend (Barbara Z.), sometimes stayed at the house and slept with defendant on the couch. Defendant considered P.W. to be like his adopted daughter. Defendant asked Carrissa how he should bathe P.W., and Carrissa B. told him that P.W. was old enough to bathe herself.

While staying at the house, Carrissa B. searched for evidence that defendant had cheated on her. During her search, Carrissa discovered multiple videos of defendant molesting P.W. in his bedroom.

Carrissa B. told a friend what she had found, and Carrissa believed the friend told defendant. Because defendant previously had threatened her with a gun, Carrissa said she would not say anything about the molestation if defendant would go to counseling. Carrissa moved out of the home three months later.

Before moving out, Carrissa B. took several secure digital cards (SD memory cards) from defendant's room that contained additional evidence showing defendant molesting P.W. Instead of giving the SD memory cards to the police, Carrissa gave them to a friend named Sarah, telling Sarah to keep them for her but not to look at them.

---

[1]     To protect their privacy, we refer to the victim and witnesses by their first names and last initial or initials. (Cal. Rules of Court, rule 8.90(b)(4), (10).) Further undesignated rule references are to the California Rules of Court.

[2]     Neither defendant nor Carrissa B. had custody of their sons. The parties stipulated that Carrissa was charged with felony child abuse of her infant daughter and misdemeanor possession of methamphetamine in March 2023, and that no promises, benefits or inducements had been offered to her for testifying in this case.

Carrissa B. also took two pairs of P.W.'s underwear from a dresser drawer in defendant's room that appeared to have semen on them. Carrissa B.'s mother put Carrissa's belongings, including P.W.'s underwear, in storage.

Carrissa B. used Facebook to contact Barbara Z., P.W.'s mother, telling her that defendant had molested P.W. and that she would give Barbara the SD memory cards she had taken from defendant's home. Carrissa B. sent Barbara videos she found on defendant's cell phone, including one video that was played for the jury that showed defendant, who was only wearing a towel, telling a completely naked P.W. that she did not need to wear any clothes as she attempted to pull on a pair of shorts. Barbara Z. responded that she did not know what Carrissa B. was talking about and denied seeing anything strange in the video.

Carrissa B. sent Barbara Z. multiple Facebook messages with attached images or videos warning her about the molestation, including one message that stated: "I needed to show you this. He molested your daughter." "There's more videos, but I can't send those over Facebook." She told Barbara Z. that the videos on the SD memory cards showed defendant touching P.W. According to Carrissa B., in one of these videos that Carrissa B. saw on an SD memory card, defendant was in bed with P.W., he put his hands down her underwear and "finger[ed]" her vagina. Barbara Z. did not respond to Carrissa B.'s Facebook messages about P.W. being molested.

In other Facebook messages, Carrissa B. asked Barbara Z. whether she "[gave] a fuck that your kid was molested," telling her she hoped Barbara Z. would do something about it and that Carrissa B. would get justice for the girl. Carrissa B. told Barbara Z. that defendant had "admitted it himself," and that he had groomed P.W. so that she thought of defendant as her boyfriend and would not tell on him. Carrissa B. testified that defendant had admitted to her that he had touched P.W., showed P.W. his genitals, and engaged in oral sex with P.W., although he denied having sexual intercourse with P.W.

3

Carrissa B. also messaged defendant through Facebook, telling him that she had "showed Barbara." Defendant responded, "I said I was going to go to counseling." He downplayed the video showing P.W. naked as "not that bad." Carrissa B. then questioned defendant about other videos she had seen showing him "fondling" P.W. and "humping" her, and one in which he told P.W., "Who told you that my parts and your parts won't fit? We just got to take time. You just have to take your time and it will work." Defendant never denied that these other videos existed.

At one point, defendant responded that he had asked P.W. if she ever felt he was inappropriate with her or made her feel uncomfortable if he exposed himself to her. Carrissa B. replied that defendant had said he had exposed himself to P.W., which defendant never denied. Defendant then messaged Carrissa B. that he had "sat down with [P.W.] and Barbara and have thoroughly moved past. And [that Carrissa sending Barbara the videos was] causing more trauma." When Carrissa B. said she knew Barbara Z. would not do anything about the molestation, defendant responded, "I haven't caused any more trauma. If anything, I have reassured myself as well as [P.W.] that everyone is on the same page. No one is hurt. No one is in trouble. And nothing is going to happen like what's being put out there."

In another Facebook message sent after Carrissa B. had moved out of his house, defendant told Carrissa, "You know if I wanted, Mike would tell me where the fuck you are, right?" He also complained that Carrissa had let him "go insane trying to find" the SD memory cards, referring to the fact that he had literally ripped apart the entire house trying to locate the SD memory cards after she had secretly taken them.

Carrissa B. admitted she was mad at defendant for cheating on her when she snooped through his things. She never retrieved the SD memory cards from Sarah because Sarah had stopped talking to her for an unknown reason. However, Carrissa had told law enforcement that she had given the SD memory cards to Sarah and she told them where Sarah lived. Because she was scared that defendant would harm her for taking the SD memory cards, she did not tell him where she went after moving out.

4

Butte County Sheriff's Deputy Angela Runyon responded to a possible child molestation call on November 16, 2022, and interviewed Carrissa B. and her mother. That same day, Deputy Runyon contacted defendant at his home and collected his cell phone, drug paraphernalia, and nearly 25 grams of methamphetamine, as well as a loaded firearm that was found on defendant's mother's dresser. Several electronic devices were also confiscated, as well as a wooden box with handcuffs, a lock of blond hair, and a metal vaginal speculum.

Butte County Sheriff's Detective Mary Barker interviewed defendant later that night and into the early morning hours of November 17, 2022. Video excerpts of defendant's police interview were played for the jury.

According to Detective Barker, defendant showed no symptoms of being under the influence of methamphetamine during the interview, although he claimed that he had been using narcotics and had been up for the past few days. He repeatedly asked whether the officers had seen any videos from the SD memory cards, which he seemed very concerned about. Although the officers did not actually have the SD memory cards, Detective Barker did not disclose that to defendant, hoping he would provide them with additional information.

Defendant admitted that he took a picture of P.W. on his bed with her legs open with her genitals exposed as well as the video that Carrissa B. found on his cell phone showing P.W. naked; he also admitted taking a picture of P.W. holding his gun. Defendant admitted showering with P.W., and ejaculating into P.W.'s underwear.[3] He explained that the wooden box found in his house with the handcuffs, lock of P.W.'s hair, and vaginal speculum was a keepsake box for mementos.

---

[3]     A DNA analysis of the two pairs of girl's underwear Carrissa B. took from defendant's bedroom tested positive for seminal fluid or sperm cells. The ratio of the likelihood that it was defendant's DNA in the underwear was in the octillions for one sample and in the septillions for the other sample. P.W. was excluded as being a source of the DNA samples taken from both pairs of underwear.

During the police interview, defendant eventually admitted that he had "dry hump[ed]" P.W., with clothes on and off, kissed her on the lips, orally copulated P.W.'s vagina, attempted to penetrate P.W.'s anus on two occasions, rubbed his fingers between her labia, rubbed and touched her genitals with his hands and penis, and had P.W. touch his penis. Defendant admitted that he "started to get aroused by the molestation" and that at one point he got a "halfway erection" during these incidents. Defendant claimed that it was P.W.'s idea to engage in anal intercourse.

On computer hard drives collected from defendant's bedroom, Detective Barker found images of a different minor girl approximately P.W.'s age who was completely nude with her vagina and breasts exposed as well as an up-close image of a minor girl's vaginal area. Additionally, similar images were also found on the computer hard drives.

Detective Barker testified that law enforcement was unsuccessful in retrieving the SD memory cards from Sarah, although she did not prepare a search warrant for Sarah's residence to confirm she did not have them. Sarah told Deputy Runyon that she had no idea about any SD memory cards, although she confirmed she knew Carrissa B. and had spoken with her approximately three weeks prior. Sarah's fiancé told Deputy Runyon he had thrown away a small black bag that Sarah had recently received from a friend but he had not looked inside the bag before discarding it.

Defendant's Facebook messages contained multiple images of firearms and one message from his mother asking why a door was left open with the defendant's gun sitting where anyone could see and take it. Defendant and Barbara Z. also communicated through Facebook, with defendant asking Barbara to tell P.W. that he missed her and to "give [P.W.] a hug, kiss, and a candy from me." Barbara also let defendant know when she received the video from Carrissa B. where P.W. was naked. Barbara later asked defendant if she could come to his house, and defendant responded that she could come over only if she brought P.W. with her, which Barbara promised to do. In a subsequent Facebook message, defendant told Barbara that he had fed P.W. and that she had showered, but he was going to make her shower again because she had not washed her

6

hair.  P.W. would also use her mother's Facebook account to message defendant, often telling him she loved him a lot.

P.W., who was eight years old at the time of trial and had been removed from Barbara Z.'s custody, testified that Barbara would drop her off with defendant, who was her friend, and they would "hug and have food together."  She sometimes stayed with defendant for a couple of days and would sleep with defendant in his bed.  If Barbara ever stayed, P.W. and defendant would sleep in his bedroom and Barbara would sleep on a couch outside the bedroom.  According to P.W., defendant's mother was at the house and slept in the room next to defendant's bedroom.

P.W. testified she and defendant had "secrets" that she did not tell anyone.  She denied that defendant was ever mean to her or that he had hurt her or done anything bad to her.  P.W. was unable to identify defendant at trial, but she did identify defendant in a picture that had previously been shown to her during a child abuse response team (CART) interview.  Video excerpts of P.W.'s CART interview were played for the jury.  During the CART interview, P.W. told the interviewer that she slept in defendant's bed with defendant when she stayed at his house, that he had guns, that they were best friends, that he had kept a lock of her hair, and that she and defendant had secrets that she did not tell.

Defendant, who was 31 years old at the time of trial, testified on his own behalf.  He described his on-again, off-again relationship with Carrissa B. as toxic with a lot of cheating, dishonesty, and malice; he and his mother forced her to leave their home after their arguments turned physical.  Carrissa was not happy about being kicked out and had messaged defendant on Facebook that because he had ruined her life, she was going to ruin his.  A few days later, police detained defendant related to the present charges.

Defendant said he was shocked the video of P.W. naked existed on his cell phone, claiming he was unsure how or why it got there.  Once Carrissa B. confronted him about the video, he immediately deleted it.

7

According to defendant, Barbara Z. and P.W. often slept at his house, and they sometimes all slept together and sometimes P.W. would fall asleep in his bed. During this period, defendant admitted he had used a lot of drugs, including methamphetamine. He claimed he was concerned about the SD memory cards during his police interview because they contained sex videos of defendant and a former adult girlfriend. He denied that the SD memory cards contained any child pornography.

Defendant testified he was "coerced" into admitting he had molested P.W. during his police interview because at the time he was emotionally vulnerable, the interview lasted a long time, and it did not seem like the police believed his initial denials. He denied having done any of the sexual acts to P.W. that he had previously admitted to during the police interview. He was unsure how his semen was found in P.W.'s underwear, but he thought maybe Carrissa B. had planted it there. While defendant admitted he had "secrets" with P.W., he claimed they were "firearm related," because he had taken her out shooting before, or related to eating "desserts" together or him driving to the store without a license.

Defendant suggested that Carrissa B. had logged into his Facebook account and created fake messages to herself saying he was going to go to counseling when she confronted him about molesting P.W. He admitted filming the video of P.W. when she was naked but claimed he was unaware his cell phone camera was recording and said that he was simply telling her she did not have to put dirty clothes back on after her shower.

Defendant admitted he had conducted multiple searches on his cell phone for pornographic material involving teens, young girls, and stepfathers having sex with their stepdaughters. He also admitted that he had attempted to visit the dark web.

B.    *The Verdicts and Sentencing*

The jury found defendant guilty of oral copulation with a child 10 years old or younger (Pen. Code,[4] § 288.7, subd. (b); count 1), two counts of sexual penetration with a child 10 years old or younger (§ 288.7, subd. (b); counts 2 & 3), assault with intent to commit sodomy on a person under age 18 (§ 220, subd. (a)(2); count 4), two counts of lewd acts on a child under age 14 (§ 288, subd. (a); counts 5 & 6), possession of child pornography (§ 311.11, subd. (a); count 7), possession of methamphetamine while armed with a firearm (Health & Saf. Code, § 11370.1, subd. (a); count 8), misdemeanor possession of a controlled substance (Health & Saf. Code, § 11377, subd. (a); count 9), and misdemeanor possession of drug paraphernalia (Health & Saf. Code, § 11364, subd. (a); count 10).

Defendant was sentenced to a determinate term of 12 years 8 months consecutive to 45 years to life in prison.  He received the midterm of seven years on count 4, the principal count, and consecutive one-third the midterm sentences of two years each for counts 5 and 6, eight months for count 7, and one year for count 8, as well as a concurrent term of six months for count 10 with credit for time served.  The trial court imposed consecutive terms of 15 years to life each for counts 1 through 3 and imposed and stayed (§ 654) one year for count 9.

Defendant timely appealed.

## DISCUSSION

## I

*Mother's Testimony*

Defendant contends the trial court improperly precluded him from presenting the testimony of his mother, which violated his constitutional rights to due process and to present a defense.  He argues the court erred by (1) excluding his mother's proffered

---

[4]    Further undesignated section references are to the Penal Code.

9

testimony under Evidence Code section 352; (2) refusing to grant a continuance to give the defense time to secure her presence; and (3) declining to allow the defense to reopen its case to present her testimony when she later became available. Based on these alleged errors, defendant asserts that counts 1 through 7 must be reversed. We are not persuaded.

A. *Additional Background*

Following defendant's testimony, defense counsel informed the trial court that the defense intended to call one additional witness, defendant's mother; he anticipated her testimony would take approximately 20 minutes. Defendant's mother apparently had to be picked up from her home, so the trial court scheduled her testimony for the next day at 9:00 a.m.

The next morning, the defense investigator explained that he had called defendant's mother that morning to coordinate picking her up to testify. According to the investigator, she had a few health issues, and when he spoke to her, she was having a panic attack and was having trouble breathing. Defendant's mother told him she was not prepared to come to testify and asked if the defense really needed her. She then told the investigator she did not want to leave her house and hung up on him.

The trial court asked defense counsel for an offer of proof as to what he anticipated defendant's mother would testify about. Defense counsel explained that there was evidence during trial that defendant and his mother lived in a double-wide trailer with adjoining rooms and that she was present in the residence when the alleged sexual abuse occurred. He anticipated defendant's mother would testify that there was never any type of sexual conduct in her presence, that she was unaware of any such conduct occurring, that she knew the volatile history between defendant and Carrissa B., and that she had basically kicked Carrissa out of the home shortly before the sexual abuse allegations surfaced.

After considering defense counsel's offer of proof, the trial court stated that it was "not inclined to delay proceedings any further" "in an effort to try to persuade the witness to come to court." Defense counsel asked whether it would be possible to have

10

defendant's mother testify remotely via Zoom, but the prosecutor objected that she would not be able to fairly and fully cross-examine the witness with numerous exhibits showing the mother and defendant communicated about P.W. being left alone with defendant, acknowledging she was exposed to sexual abuse, and asking whether they should get her help. The trial court ruled it would not allow the witness to testify remotely, and defense counsel made no further objection. The court proceeded to instruct the jury.

After the trial court finished instructing the jury, defense counsel informed the court, outside the jury's presence, that during the instructions, his investigator told him that he had received a call from defendant's mother who said she was now available to be picked up as her panic attack had apparently ended. Defense counsel asked the court to reconsider its previous ruling, but the court declined. Defendant's mother did not testify.

B.      *Analysis*

1.      *Evidence Code Section 352*

Defendant first contends the trial court improperly excluded his mother's testimony under Evidence Code section 352. As the People correctly note, however, the trial court did not prohibit defendant's mother from testifying based on Evidence Code section 352. In fact, the trial court had scheduled the mother to testify on the morning of July 28, 2023. She simply refused to show up at the scheduled time. At no time during the discussions surrounding the mother's refusal to come to court did either party or the court raise or otherwise mention Evidence Code section 352. Defendant's claim for the first time on appeal that the court erred under Evidence Code section 352 is thus not cognizable on appeal. (See *People v. Valdez* (2012) 55 Cal.4th 82, 138 [Evid. Code, § 352 argument forfeited by failing to object on this basis at trial].)

2.      *Denial of Continuance*

Defendant next argues that the trial court erroneously refused to grant him a continuance to give him time to secure his mother's presence at trial, which violated his due process rights. Nothing in the record shows defendant expressly requested a continuance, however. "[A] trial court generally is under no obligation to continue a

11

matter for the defense in the absence of a request." (*People v. Beames* (2007) 40 Cal.4th 907, 923.) Where a defendant does not seek a continuance at trial, any claim that a trial court should have granted an unrequested continuance sua sponte is not properly before an appellate court. (*People v. Alcala* (1992) 4 Cal.4th 742, 782.) However, to the extent defendant impliedly requested a continuance, as the People characterize the record, we shall consider the merits of defendant's claim.

A continuance in a criminal trial may be granted only for good cause, and whether such cause exists rests in the sound discretion of the trial court. (§ 1050, subd. (e); *People v. Gonzalez* (2021) 12 Cal.5th 367, 387; *People v. Reed* (2018) 4 Cal.5th 989, 1004.) "Under this state law standard, discretion is abused only when the court exceeds the bounds of reason, all circumstances being considered." (*People v. Beames*, *supra*, 40 Cal.4th at p. 920.) Motions to continue a criminal matter are disfavored (rule 4.113), and an order denying a continuance "is seldom successfully attacked." (*Beames*, at p. 920; rule 4.113 [motion for continuance will be denied unless the moving party, under § 1050, affirmatively proves in open court that the ends of justice require a continuance].)

While a trial court's denial of a continuance may violate due process under some circumstances, "not every denial of a request for more time can be said to violate due process, even if the party seeking the continuance thereby fails to offer evidence." (*People v. Beames*, *supra*, 40 Cal.4th at p. 921.) The particular circumstances of each case, especially the reasons presented to the judge at the time the request is made, are relevant. (*Id.* at p. 921.) Where, as here, a defendant seeks to continue trial to secure the attendance of a witness, the defendant must show: (1) he exercised due diligence to secure the witness's attendance; (2) the witness's expected testimony was material and not cumulative; (3) the testimony could be obtained within a reasonable time; and (4) the facts to which the witness would testify could not otherwise be proven. (*People v. Jenkins* (2000) 22 Cal.4th 900, 1037.) "The court considers ' "not only the benefit which the moving party anticipates but also the likelihood that such benefit will result, the

12

burden on other witnesses, jurors and the court and, above all, whether substantial justice will be accomplished or defeated by a granting of the motion." ' " (*Ibid.*)

Here, defense counsel had arranged to have his investigator pick up defendant's mother and bring her to court to testify so it appears defendant exercised diligence in attempting to secure his mother's attendance at trial. Defendant, however, made no showing that his mother would be willing and able to testify at any definitive time in the future after she told his investigator she did not want to come to court and hung up on the investigator when he contacted her on the morning of her scheduled testimony. In other words, as the People properly argue, there was no showing that the mother's appearance was likely to be procured if the court granted a continuance.

And while defense counsel proffered the mother would testify that she lived with defendant, that she never witnessed any sexual abuse, and that Carrissa B. and defendant had a volatile relationship, other witnesses had already testified to those matters. Defendant himself denied that he ever sexually abused P.W. in the home he shared with his mother, and P.W. testified that defendant was her friend who would protect her and that he never hurt her or did anything bad to her. During P.W.'s CART interview, excerpts of which were shown to the jury, she did not accuse defendant of any sexual misconduct. Both defendant and Carrissa testified about the fraught nature of their on-again, off-again relationship, which was plagued by drugs, cheating, threats of violence, and physical arguments. Thus, the mother's anticipated testimony was cumulative to other evidence already presented during trial.

Furthermore, evidence showed defendant recorded the video of P.W. naked in his bedroom, that he took a picture of her on his bed with her genitals exposed, that he recorded videos of himself molesting P.W. on his bed, that he touched her genitals in his bed, and that he slept with P.W. alone in his bedroom while his elderly mother rarely got out of her bed in her own bedroom. Because defendant's mother was not present in defendant's bedroom, her anticipated testimony that she had not witnessed any abuse would not have been materially significant to the key issue in this trial, namely, what

13

occurred between defendant and P.W. while they were alone in his room. Indeed, other evidence showed that defendant at times made efforts to conceal his conduct from others in the home, as he admitted to police that during one attempt at engaging in anal sex with P.W., he stopped because he thought he heard someone coming toward his room who might discover what he was doing.[5]

*Bennett v. Scroggy* (6th Cir. 1986) 793 F.2d 772, cited by defendant, does not compel a different result. (See *Garcia v. Superior Court* (1996) 42 Cal.App.4th 177, 181 [while state courts are obligated to follow the decisions of the United States Supreme Court, they are not bound by the decisions of lower federal courts].) There, the court granted habeas relief to a defendant whose request for a continuance to procure a witness was denied, in violation of the Sixth Amendment. (*Bennett*, at pp. 774-775, 779.) But the defendant in *Bennett* expressly requested a continuance, had already interviewed and subpoenaed the witness who did not appear in court, and had offered to submit the witness's affidavit attesting to the victim's reputation for violence, and the government did not dispute that the witness's testimony was expected to be favorable to the defendant. (*Id.* at pp. 774-775.) Here, it is debatable whether defendant actually requested a continuance but, even if he impliedly did so, no evidence shows defendant subpoenaed his mother prior to trial. Defendant acknowledges as much when he asserts

---

[5] Although defendant repeatedly characterizes his mother as a "neutral third party witness," who would have called Carrissa B.'s credibility into question, it is unlikely the jury would have viewed her as such based on the instructions given. Instead, as the People argue, it is reasonably probable the jury would have considered defendant's mother's testimony to be biased in favor of defendant, her own son, and only caretaker. Under CALCRIM No. 105, as given to the jury, the jury could properly consider whether a witness's testimony was influenced by a factor such as bias or prejudice, a personal relationship with someone involved in the case, or a personal interest in how the case was decided.

in his reply brief that "if it came to it," he "could've compelled her attendance."[6] Furthermore, as we have previously found, defendant's mother's anticipated testimony was either largely cumulative of evidence already presented or was otherwise immaterial because she was not present in defendant's bedroom where the alleged sexual abuse occurred.

Under these circumstances, we conclude the trial court did not abuse its discretion or violate defendant's due process rights by declining to continue the trial to permit defendant additional attempts to procure his mother's cumulative and nonmaterial testimony, especially given her refusal to appear at the court. (Compare *Jennings v. Superior* (1967) 66 Cal.2d 867, 871-876 [trial court erred in denying the defendant's request to continue the preliminary hearing for four days to procure the testimony of a witness who was the only other person in the car with the defendant prior to his arrest, and the defendant claimed she had set him up with the police to frame him for a narcotics offense; the witness's testimony was not cumulative or obtainable from another source].)

3.      *Request to Reopen Evidence*

For similar reasons, we also find no merit in defendant's contention that the trial court erred by not allowing him to reopen his case when his mother supposedly told his investigator that she was available to testify later that morning. "The decision whether to reopen a criminal matter to permit the introduction of additional evidence is a matter left to the broad discretion of the trial court." (*People v. Jones* (2012) 54 Cal.4th 1, 66.) In determining whether an abuse of discretion occurred, a reviewing court considers (1) the stage the proceedings had reached when the motion was made, (2) the defendant's diligence, or lack of diligence, in presenting the new evidence, (3) the prospect the jury

---

**6**      While defendant's mother was listed as a potential prosecution witness, it is not clear from the record whether the prosecution actually subpoenaed her for trial. She did not testify on the People's behalf.

15

would accord the new evidence undue emphasis, and (4) the significance of the evidence. (*People v. Homick* (2012) 55 Cal.4th 816, 881.)

Here, after both parties had rested and the trial court had finished instructing the jury, defense counsel asked the trial court to reconsider its ruling about not delaying the trial further to allow defendant's mother to testify because she had apparently called the defense investigator during the instructions and said she could now testify. The court appears to have impliedly found that the mother's proffered testimony was insufficient to warrant reopening. This implicit finding corresponds to the fourth factor of the abuse analysis. If the evidence was indeed insignificant, then the trial court could not have abused its discretion in denying defendant's motion to reopen and present it. (*People v. Homick*, *supra*, 55 Cal.4th at p. 881.)

As previously discussed, defendant's mother's testimony was cumulative and also immaterial or irrelevant to the main issue at trial—whether defendant had sexually abused or molested P.W. while he was alone with her in his bedroom. Thus, the mother's testimony would not have substantially supplemented or altered the jury's perception of defendant's primary defense at trial that, despite his statements to police, he did not sexually assault or molest P.W. (See *People v. Jones*, *supra*, 54 Cal.4th at p. 67.) Under the circumstances, we find no error.

II

*Instruction on Lesser Included Offense*

Defendant contends the trial court violated state law and his federal due process rights by failing to instruct on attempted sexual penetration (§§ 664, 288.7, subd. (b)) as a lesser included offense to sexual penetration of a child 10 years or younger as alleged in counts 2 and 3. We find no error as no substantial evidence showed the offenses alleged in counts 2 and 3 were less than that charged.

A.    *Additional Background*

During the jury instruction conference, the parties agreed for counts 1 through 3 to instruct the jury with CALCRIM No. 1128, the pattern jury instruction on engaging in

16

oral copulation or sexual penetration with a child 10 years of age or younger in violation of section 288.7, subdivision (b). The trial court specifically asked defense counsel whether he approved of CALCRIM No. 1128 as prepared by the prosecution, and defense counsel responded, "yes." The court later asked whether defendant was asking for any other instructions, and after consulting with defendant, defense counsel informed the court that they were "not asking for any additional instructions." The trial court instructed the jury with CALCRIM No. 1128 as agreed.

During closing argument, the prosecution argued that defendant's admissions to police that he touched P.W.'s vagina with his finger like "a credit card," "between the ridges" of her outer labia proved beyond a reasonable doubt that he sexually penetrated P.W., as that term is legally defined, in violation of section 288.7 as alleged in counts 2 and 3. Based on P.W.'s trial testimony that defendant never did anything to hurt her, her CART interviews in which she never accused him of acting inappropriately with her, and defendant's own testimony at trial denying that he did any of the things to P.W. that he had earlier admitted to police, defense counsel argued during closing that while defendant might be less than an ideal babysitter or housekeeper, he did not sexually assault P.W. and the jury should acquit defendant of the charges.

B.      *Analysis*

Trial courts must instruct the jury sua sponte on lesser included offenses when the evidence raises a question regarding whether all the elements of the charged offense were present. However, no such instructional duty exists when there is no evidence that the offense was less than that charged. (*People v. Barton* (1995) 12 Cal.4th 186, 194-195.) A duty to instruct does not arise "unless there is some evidence, not merely minimal or insubstantial evidence but evidence from which a jury could reasonably conclude, that the offense was less than that charged." (*People v. Jones* (1992) 2 Cal.App.4th 867, 870.) "We apply the independent or de novo standard of review to the failure by the trial court to instruct on an assertedly lesser included offense." (*People v. Cole* (2004) 33 Cal.4th 1158, 1218.)

An attempt to commit a crime can constitute a lesser included offense of a completed crime. (*In re Sylvester C.* (2006) 137 Cal.App.4th 601, 609 ["attempt is a lesser included offense of any completed crime"]; *People v. Meyer* (1985) 169 Cal.App.3d 496, 506 ["every substantive criminal offense necessarily includes the attempt to commit it"].) And courts have recognized that an attempt to commit sexual penetration is a lesser included offense of sexual penetration in violation of section 288.7, subdivision (b) as both offenses are specific intent crimes and the attempted crime is only distinguished from the substantive crime by the failure to complete the actus reus. (See, e.g., *People v. Ngo* (2014) 225 Cal.App.4th 126, 157 [recognizing that attempted sexual penetration is a lesser included offense under the "elements test" for determining lesser included offenses].)

Section 288.7, subdivision (b) provides, in relevant part, as follows: "Any person 18 years of age or older who engages in oral copulation or sexual penetration, as defined in Section 289, with a child who is 10 years of age or younger is guilty of a felony and shall be punished by imprisonment in the state prison for a term of 15 years to life."

Section 289, subdivision (k)(1), in turn, defines "sexual penetration" as follows: " 'Sexual penetration' is the act of causing the penetration, however slight, of the genital or anal opening of any person or causing another person to so penetrate the defendant's or another person's genital or anal opening for the purpose of sexual arousal, gratification, or abuse by any foreign object, substance, instrument, or device, or by an unknown object."

Contact with the female "genitalia inside the exterior of the labia majora constitutes 'sexual penetration' within the meaning of section 289." (*People v. Quintana* (2001) 89 Cal.App.4th 1362, 1371; see also, *id.* at p. 1364 [definition of sexual penetration in § 289 "refers to penetration of the labia majora, rather than penetration of the vagina"].)

Viewing the evidence in the light most favorable to defendant (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137), we conclude the trial court was not required to

instruct on the lesser offense of attempted sexual penetration. While it is true that defendant initially claimed to police that he rubbed P.W.'s vagina but did not "push into" or "penetrate" her vagina, vaginal penetration is *not* required under the definition of sexual penetration under section 289, subdivision (k)(1). (See *People v. Quintana*, *supra*, 89 Cal.App.4th at p. 1371.)

Detective Barker testified it is common in sexual abuse cases for suspects to initially downplay their culpability or limit their disclosure of what exactly occurred during a specific incident only to later give greater details of the abuse. That was true here.

Despite defendant's initial claim that he did not push into P.W. when touching her crotch, he later admitted to Detective Barker that he had "credit carded" P.W., meaning that he ran his fingers between P.W.'s labia majora. To clarify what defendant meant by "credit carding," Detective Barker set up two parallel objects on a table to represent P.W.'s labia majora and then ran her fingers inside the space between the parallel objects. Upon viewing Detective Barker's demonstration, defendant agreed that he had run his fingers between the ridges of P.W.'s labia majora. Thus, this evidence, even when viewed in defendant's favor, showed that while he initially denied "penetrating" P.W., he had completed the actus reus of the substantive offense by running his fingers between her labia majora.

Defendant's testimony at trial, however, was that he did *not* do any of the things to P.W. that he had admitted to in his police interview. Notably, defendant did not testify that he attempted to penetrate P.W.'s labia majora or vagina but was unsuccessful in doing so. Instead, he denied touching her *at all*. Thus, there was no substantial evidence from which the jury could have reasonably concluded that defendant took preparatory steps to penetrate P.W. but failed to complete the necessary actus reus even if it believed his trial testimony over his previous admissions to police.

This case, then, is unlike *People v. Ngo*, *supra*, 225 Cal.App.4th at page 126, on which defendant relies. In *Ngo*, the victim stated consistently to police that the defendant

19

touched her but was equivocal as to whether he penetrated her. (*Id.* at pp. 134-139.) The victim's mother stated to police and testified at trial that she walked into the living room, interrupting the defendant's touching of the victim. Although she testified that she saw the defendant's hand in the victim's pants, she did not see whether the defendant penetrated the victim. The mother told police that she did not believe the defendant had penetrated the victim. The defendant denied consistently that he penetrated her when he touched her. (*Id.* at pp. 139-140.) *Ngo* concluded the evidence was "consistent with the possibility that defendant attempted to penetrate [the victim], but that Mother interrupted the attempt when she walked into the room" and supported an instruction on the lesser included offense of attempted sexual penetration, which the trial court failed to give sua sponte. (*Id.* at p. 157.)

In this case, the jury was asked to decide whether defendant digitally penetrated P.W. based on his admission that he touched his fingers between the ridges of her labia majora or whether defendant did not touch the victim at all given his complete denial during his trial testimony. This is unlike *Ngo* where the evidence conflicted over whether defendant, who was caught with his hand down the victim's pants, had penetrated the victim.

Given the above, we conclude the trial court did not err in not instructing the jury sua sponte on attempted sexual penetration as a lesser included offense. No substantial evidence supported such a theory.

### III

### *Cumulative Error*

Defendant contends that, as to counts 2 and 3, the combined effect of the purported errors was sufficiently prejudicial to require that the verdicts on those counts be vacated even if the errors, when considered individually, were harmless.

Because we have found no errors regarding the absence of testimony from defendant's mother or based on the instructions given to the jury, we find there is no error to accumulate. Defendant received due process and a fair trial; nothing more was

20

required.  (*People v. Rivas* (2013) 214 Cal.App.4th 1410, 1436 [the litmus test for cumulative error analysis is whether a defendant received due process and a fair trial].)

DISPOSITION

The judgment is affirmed.


\s\
_____
Krause, Acting P. J.

We concur:


\s\
_____
Boulware Eurie, J.


\s\
_____
Wiseman, J.*

---

* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.